UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
EDWIN ESTRADA,

                    Plaintiff,

          -against-                         MEMORANDUM & ORDER
                                            13-CV-1243(JS)(ARL)
ST. FRANCIS HOSPITAL,

                    Defendant.
----------------------------------X
APPEARANCES
For Plaintiff:        Matthew Brian Weinick, Esq.
                      Famighetti & Weinick, PLLC
                      155 Pinelawn Road, Suite 220S
                      Melville, NY 11747

For Defendant:        Christopher G. Gegwich, Esq.
                      Tania Jaynelle Mistretta, Esq.
                      Nixon Peabody LLP
                      50 Jericho Quadrangle, Suite 300
                      Jericho, NY 11753


SEYBERT, District Judge:

          Plaintiff Edwin Estrada ("Estrada") commenced this

action on March 8, 2013 against St. Francis Hospital ("the

Hospital"), and others, alleging that the Hospital: (1)

discriminated against him in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"); (2)

retaliated against him in violation of the ADA and Family Medical

Leave Act, 29 U.S.C. 2601 et seq. (the "FMLA"); and (3) subjected

him to a hostile work environment in violation of the ADA. Pending

before the Court is the Hospital's motion for summary judgment

(Docket Entry 28).  For the reasons that follow, the Hospital's motion is GRANTED.

BACKGROUND[1]

The Hospital is a non-profit organization specializing in heart surgery, cardiac catheterization and angioplasty, and the diagnosis and treatment of abnormal heart rhythms. (Def.'s 56.1 Stmt., Docket Entry 23-1 ¶¶ 1-2.)  The Hospital operates the DeMatteis Center for Cardiac Research and Education (the "DeMatteis Center"), which offers cardiac radiologic and magnetic resonance imaging ("MRI") services. (Def.'s 56.1 Stmt. ¶¶ 3-5.) An MRI of the heart taken at the DeMatteis Center produces three dimensional images enabling physicians to detect changes in the structure of the patient's heart to better diagnose and treat cardiac disease.  (Def.'s 56.1 Stmt. ¶ 6.)  The DeMatteis Center performs MRI imaging both for purposes of clinical treatment and in furtherance of research studies.  (Def.'s 56.1 Stmt. ¶¶ 9-10.) An MRI examination performed in connection with research has its own set of sequences, protocols, and parameters.  (Def.'s 56.1 Stmt. ¶ 11.)

Estrada began working as an MRI technologist at the DeMatteis Center on July 30, 2007. (Def.'s 56.1 Stmt. ¶ 17.)

---

[1]  The following facts are drawn from the parties' 56.1 statements and their affidavits and other evidence in support.

Before he was hired by the Hospital, Estrada worked as a radiologist and technologist for fifteen years at various New York hospitals. However, he did not have any prior experience performing cardiac MRI examinations. (Def.'s 56.1 Stmt. ¶¶ 18-19.)

As an MRI technologist at the DeMatteis Center, Estrada's responsibilities included producing and evaluating clinical and research cardiac MRI examinations, using MRI scanners to capture specific images ordered by physicians, adhering to all MRI protocols, working with physicians to develop research protocols, processing data to be analyzed, preparing and operating the equipment, positioning patients, and capturing the requested images. (Def.'s 56.1 Stmt. ¶ 21.)

During his employment with the Hospital, Estrada reported to William Schapiro ("Schapiro"), a Technical Manager for MRI Imaging at the DeMatteis Center. (Def.'s 56.1 Stmt. ¶ 25.) Schapiro performed MRI examinations on a daily basis and was responsible for training Estrada. (Def.'s 56.1 Stmt. ¶¶ 26, 29.) Schapiro reported to Julia Vinsky ("Vinsky"), the Administrative Director of Prevention, Research & Education. (Def.'s 56.1 Stmt. ¶ 27.) During his employment, Estrada also worked with Nathaniel Reichek, M.D., ("Dr. Reichek"), the Director of Research and Education Programs and the Director of the Cardiac Imaging Program. (Def.'s 56.1 Stmt. ¶ 28.) Dr. Reichek worked with Estrada on a

3

weekly basis and observed him performing MRI examinations. (Def.'s 56.1 Stmt. ¶ 31.)

Estrada received a "meets" rating on his annual performance appraisal during the 2007 to 2008 timeframe. (Def.'s 56.1 Stmt. ¶ 32.) Schapiro commented on the performance appraisal, "Ed takes responsibility for his errors and strives to learn and improve from past lessons." (Def.'s 56.1 Stmt. ¶ 36.) Because of concerns that Vinsky had about the quality of Estrada's work, however, he was put on a "continuous improvement plan." (Pl.'s Counterstmt, Docket Entry 45, ¶ 33.)

Following the receipt of his 2007 to 2008 performance appraisal, Estrada continued to have performance problems. Schapiro spoke with Estrada on more than one occasion about the length of time it took Estrada to complete MRI examinations. (Estrada Dep., Docket Entry 44-2, 38:13-41:15.) Estrada testified during his deposition that he liked to take the time to develop a rapport with patients and claimed that Schapiro criticized him for taking too long to complete them. (Estrada Dep. 41:2-41:18; 49:25-51:12.)

During the 2008 to 2009 timeframe, Estrada again received a "meets" rating on his performance appraisal. (Schapiro Aff., Docket Entry 32, Ex. B.) The appraisal also notes that "Ed is having some difficulty with the technical parameters of cardiac imaging[,] as well as through put." (Schapiro Aff. Ex. B at 4.)

Through put refers to the amount of time an MRI technologist takes to perform an MRI examination. (Def.'s 56.1 Stmt. ¶ 39.) On October 6, 2009, Schapiro met with Estrada to discuss ways in which Estrada could improve his performance and a specific improvement plan. (Def.'s 56.1 Stmt. ¶ 56.)

Following the issuance of Estrada's 2008-2009 appraisal, Angela Montemarano, a Human Resources Generalist, spoke with Schapiro and Vinsky about Estrada's performance and it was decided that Schapiro would work with Estrada to improve Estrada's performance. (Def.'s 56.1 Stmt. ¶¶ 58-59.) Several months later, Montemarano again spoke with Schapiro and Vinsky about Estrada's performance--the consensus was that Estrada's performance had not improved. (Def.'s 56.1 Stmt. ¶¶ 61-62.)

Estrada believed Schapiro had personal problems with him and testified that Schapiro would often become "short-tempered" and "irate" with him, "huffing and puffing" and "rolling his eye." (Estrada Dep. 52:5-53:17; Def.'s 56.1 Stmt. ¶ 74.) Estrada also claimed during his deposition that Schapiro would not show him how to perform MRI examinations or respond to his questions. (Def.'s 56.1 Stmt. ¶ 75.)

II. <u>December 2009 Injury</u>

On December 21, 2009, Estrada slipped outside of his home and hit his head. (Def.'s 56.1 Stmt. ¶ 76.) He went to the emergency room and was diagnosed with a concussion. (Def.'s 56.1

5

Stmt. ¶ 77.)  Estrada returned to work on December 23, 2009, but subsequently suffered two seizures. (Def.'s 56.1 Stmt. ¶¶ 78-79.) Estrada was admitted to Glen Cove Hospital and was later granted a leave of absence pursuant to the FMLA from December 23, 2009 until February 1, 2010.  (Def.'s 56.1 Stmt. ¶¶ 79-80.)  During this time, Estrada was diagnosed with diabetes and placed on anti-seizure medication.  (Def.'s 56.1 Stmt. ¶ 81.)

On his first day back from work, Schapiro had a one-on-one meeting with Estrada in Schapiro's office.  According to Estrada, Schapiro told Estrada that he needed to "speed it up with the patients" and "pick up [his] game."  (Estrada Dep. 70:5-9.) Estrada alleges that Schapiro then told him he divorced his wife while Estrada was on leave, and that the divorce was Estrada's fault.  (Estrada Dep. 70:5-9.)  Schapiro denies blaming Estrada for his divorce and claims that during their February 1, 2010 meeting he merely warned Estrada that if he "came across as distracted" it was because he was going through a divorce. (Schapiro Aff., Docket Entry 32, ¶ 26.)

On February 22, 2010, Estrada discovered that he was suffering from a subdural hematoma (blood surrounding his brain) and underwent an emergency craniotomy to relieve the pressure on his brain.  (Compl. ¶ 29; Def.'s 56.1 Stmt. ¶ 88.)  Following his surgery, Estrada was granted a second leave of absence, pursuant to the FMLA, from February 22, 2010 until April 22, 2010.  (Def.'s

56.1 Stmt. ¶ 89.)  During Estrada's two leaves of absence, which

totaled more than twelve weeks, Schapiro and another technologist

named Josh Cheng performed the clinical and research MRI

examinations.  (Def.'s 56.1 Stmt. ¶¶ 90-91.)

When Estrada returned from his second leave of absence,

his treating physicians as well as the Hospital cleared him to

return to work without any restrictions.  (Def.'s 56.1 Stmt. ¶¶

96-98.)  Upon his return, Estrada notified Schapiro that he had

been diagnosed with a seizure disorder and diabetes and he asked

that be allowed to take regularly scheduled lunch breaks.  (Def.'s

56.1 Stmt. ¶¶ 100-01.)  It is disputed whether Schapiro initially

granted Estrada's request.  Estrada testified that he was only

given a regular break after nurses began complaining.  (See Pl.'s

56.1 Counterstmt. ¶ 102.)  Nevertheless, Estrada routinely

requested--and the Hospital granted--his requests to leave early

and changed his work schedule to accommodate physician

appointments.[2]  (Def.'s 56.1 Stmt. ¶ 105.)

---

[2]  Throughout most of his employment at the DeMatteis Center,
Estrada worked from 8:00 AM to 4:00 PM.  (Def.'s 56.1 Stmt.
¶ 107.)  After Estrada began taking anti-seizure medication,
however, he was no longer able to drive.  (Def.'s 56.1 Stmt.
¶ 108; Estrada Dep. 68:22-69:4.)  At some point after Estrada
returned to work in April 2010, Schapiro changed Estrada's
working hours from 8:00 AM to 4:00 PM to 9:00 AM to 5:00 PM
during the time he was prescribed anti-seizure medication.
(Def.'s 56.1 Stmt. ¶ 109; Estrada Dep. 68:22-69:4.)  Schapiro
also relieved Estrada of the responsibility of having to perform
cardiac and research protocol MRI examinations.  (Schapiro Aff.
¶ 29.)  The Hospital characterizes the change in Estrada's hours

Following his return to work in April 2010, Schapiro and Dr. Reichek observed that Estrada had difficulty performing his duties and responsibilities and made significant mistakes performing MRI examinations. (Def.'s 56.1 Stmt. ¶ 116.) Specifically, Estrada continued to take too long to complete MRI examinations and was having difficulty with the more advanced cardiac imaging and performing research protocols. (Schapiro Aff. ¶ 36.)

In May 2010, Estrada complained to Vinsky and Dr. Reichek that Schapiro had blamed him for his divorce. (Def.'s 56.1 Stmt. ¶ 120.) Estrada testified that when he informed Dr. Reichek of the comment, he "looked at Estrada in disbelief" and said "I can't believe Bill would do that." (Estrada Dep. 76:11-19.) Dr. Reichek testified that he found Estrada's "assertion to be somewhat preposterous and delusional" and advised Estrada that his accusation was untrue. (Reichek Aff., Docket Entry 31, ¶¶ 14, 16; Def.'s 56.1 Stmt. ¶¶ 121-22.) After receiving Estrada's complaint, Vinsky investigated the issue and spoke with Schapiro, who denied blaming Estrada for his divorce. (Def.'s 56.1 Stmt. ¶ 123.)

---

as an accommodation due to Estrada's inability to drive, while Estrada claims that he never asked for his hours to be changed, that he was willing to travel with the nurses to arrive by 8:00 AM, and that Schapiro unilaterally changed his hours and removed him from hospital duties. (Pl.'s Countersmt. ¶ 109.)

Schapiro met with Estrada in May 2010 and reiterated that he did not blame Estrada for his divorce. (Def.'s 56.1 Stmt. ¶ 124.) During the meeting, Schapiro also asked Estrada if he needed any accommodations. It is undisputed that Estrada said that he was fine and did not need any accommodation. (Pl.'s Counterstmt. ¶¶ 125-26.)

Estrada claims that before a staff meeting, he saw a notepad with the words "ED IS DANGEROUS" written on it. Estrada claims that he recognized the handwriting of the note to be Schapiro's. (Estrada Dep. 89:12-91:18.) Schapiro denies writing the note. (Def.'s 56.1 Stmt. ¶ 127.)

In May 2010, Vinsky and Montemarano asked Schapiro to start documenting Estrada's performance issues. (Def.'s 56.1 Stmt. ¶ 131; Montemarano Dep., Docket Entry 34-6, 32:21-33:7.) Estrada continued to make mistakes throughout May and June of 2010. (Def.'s 56.1 Stmt. ¶ 152.) For example, on May 14, 2010, Estrada forgot to perform a particular portion of a research cardiac MRI exam. (Def.'s 56.1 Stmt. ¶¶ 138-39.) Similarly, on May 24, 2010, Estrada did not follow proper protocol while performing a cardiac research MRI exam. (Def.'s 56.1 Stmt. ¶ 143.) Estrada claimed that he was not aware of the protocol that needed to be followed in that situation. (Pl.'s Counterstmt. ¶ 143.) As a result of this incident, Jie Jane Cao, M.D., the Clinical Director of Cardiac MRI & CT at the DeMatteis Center, requested that Estrada not be

allowed to work on her research protocols. (Def.'s 56.1 Stmt. ¶ 148.) Because of Estrada's poor performance, Dr. Reichek informed Schapiro that he did not want Estrada performing MRI examinations, stress studies, or examinations on high risk patients. (Def.'s 56.1 Stmt. ¶ 149.)

During a meeting in June 2010, Schapiro and Vinsky discussed whether Estrada's medical condition or recent leave of absence could have been affecting his performance. (Def.'s 56.1 Stmt. ¶ 162.) Vinsky scheduled a meeting on June 10, 2010 with Estrada to discuss complaints that had been raised about his performance. (Def.'s 56.1 Stmt. ¶ 165.) During the meeting, Vinsky told Estrada that she was concerned for Estrada's welfare and that she wanted him to succeed at the DeMatteis Center. (Def.'s 56.1 Stmt. ¶ 166.) Vinsky also asked Estrada if there was anything the Hospital could do to assist him with performing his duties and responsibilities, and asked if he needed any reasonable accommodations. (Def.'s 56.1 Stmt. ¶ 167.) Estrada responded that he was "fine" and did not need any assistance or reasonable accommodations. (Def.'s 56.1 Stmt. ¶ 168.) After the meeting, Estrada sent Vinsky an email which stated, "[t]hank you again for your concern. I felt our meeting was very positive." (Def.'s 56.1 Stmt. ¶ 169.)

In June 2010, the Hospital decided that because of Estrada's ongoing performance issues, he required retraining.

(Def.'s 56.1 Stmt. ¶ 170.)  The Hospital therefore placed Estrada on an employee development plan in which Estrada would perform radiologic and MRI examinations under the supervision of another MRI technologist.  (Def.'s 56.1 Stmt. ¶¶ 177-79.)  Schapiro gave Estrada a copy of the written employee development plan and a memo detailing three errors he made in May 2010.  (Def.'s 56.1 Stmt. ¶ 182; Schapiro Aff. Ex. J.)

Schapiro was tasked with retraining Estrada.  (Def.'s 56.1 Stmt. ¶ 189.)  It is disputed, however, whether Schapiro did in fact did retrain Estrada.  Estrada testified that when he asked Schapiro for help, "either he was not speaking to me or he would just kind of shrug it off."  (Estrada Dep. 131:6-10.)  In addition to Schapiro, Dr. Reichek also gave Estrada constructive feedback. (See Def.'s 56.1 Stmt. ¶ 194.)

The Hospital claims that on July 9, 2010 Schapiro received a call from the Hospital's Department of Radiology regarding a cervical spine MRI examination that had been improperly performed by Estrada.  (Def.'s 56.1 Stmt. ¶ 205.)  The Hospital further claims that on July 13, 2010, Estrada was going to give the wrong consent from to a patient who was going to undergo a breast MRI exam.  (Def.'s 56.1 Stmt. ¶ 210.)

Estrada met with Schapiro on July 22, 2010 to discuss his progress on the development plan.  (Def.'s 56.1 Stmt. ¶ 212.)  Estrada claims that during this meeting, Schapiro instructed him

to sign a document indicating that he was now able to scan all protocols, and he refused to do so. (Pl.'s 56.1 Counterstmt. ¶ 214.) According to the Hospital, however, Estrada merely told Schapiro that he needed more time to review the research protocols and practice performing MRI examinations. (Def.'s 56.1 Stmt. ¶ 214.) Both Estrada and Schapiro assert that the other was visibly upset during the meeting. (Def.'s 56.1 Stmt. ¶ 216; Pl.'s 56.1 Counterstmt. 216.)

Estrada's problems continued into July and August of 2010 and Hospital administrators were concerned that Estrada's continuing performance issues were caused by Estrada's medical condition, or his recent leave of absence.[3] (Def.'s 56.1 Stmt.

---

[3] On July 28, 2010, Estrada made two errors: with one patient, he did not correct for phase alignment and with another, he used the wrong flow sequence for a portion of a cardiac research MRI exam. (Def.'s 56.1 Stmt. ¶¶ 217, 220.) Both errors resulted in patients having to undergo multiple MRI exams. (Def.'s 56.1 Stmt. ¶¶ 217, 222.) During an MRI exam on August 9, 2010 Estrada changed the parameters of the image sequence, which had the potential to render that portion of the study unusable for research purposes. Estrada claims that he changed the parameters to obtain better image quality. (Pl.'s 56.1 Counterstmt. ¶ 234.) On August 18, 2010, while working with Dr. Reichek, Estrada took still images of the patient's heart, instead of the video image that Dr. Reichek wanted. (Def.'s 56.1 Stmt. ¶¶ 238-243.) Estrada claims however that his error was merely the result of a miscommunication. (Pl.'s 56.1 Counterstmt. ¶ 243.) But because Estrada had done a large number of this particular type of examination, Dr. Reichek was "astonished" that Estrada made this error, and sent an email to Schapiro and Vinsky to bring the matter to their attention. (Pl.'s 56.1 Countersmt. ¶¶ 248-49.) As a result of this error, Reichek claims in his affirmation that he "had great concerns that [Estrada's] inability to correctly perform cardiac MRI

¶ 259.)  However, Estrada denied that any outside factor was affecting his performance.  (Pl.'s 56.1 Counterstmt. ¶ 264.)

By the end of September 2010, Schapiro determined that Estrada's performance had not improved and he had failed to meet the requirements of his employee development plan.[4]  (Def.'s 56.1 Stmt. ¶ 303.)  It is undisputed that Estrada's poor performance and need to be supervised during MRI examinations was having a negative impact on the operations of the MRI Imaging Department.  (Def.'s 56.1 Stmt. ¶ 306.)  However, Estrada blamed Schapiro's failure to properly train him for his poor performance.  (Pl.'s 56.1 Countersmt. ¶ 306.)

In early October 2010, Vinsky and Jess Bunshaft, the former Director of Employee Relations at the Hospital, met with Estrada because of concerns about Estrada's performance.  (Def.'s 56.1 Stmt. ¶¶ 309, 313; Bunshaft Aff., Docket Entry 29, ¶ 1.)

---

examinations could jeopardize patient safety . . . [and] [he] became convinced that [Estrada's] employment should be terminated."  (Reichek Aff, ¶ 25.)

[4] On September 13, 2010 Estrada took 2 hours to complete a cardiac research MRI exam.  (Def.'s 56.1 Stmt. ¶ 286.)  It is undisputed that it should have only taken approximately 60 to 75 minutes to complete an examination of this type. (Pl.'s 56.1 Countersmt. ¶ 287.)  On September 29, 2010, during the course of a standard clinical cardiac MRI examination, Dr. Cao asked Estrada to provide her with additional flow sequences, which are designed to show the rate and amount of blood flowing through the heart or major blood vessels.  (Def.'s. 56.1 Stmt. ¶ 293.)  Estrada, however was unable to provide the additional flow sequences and Mr. Cheng had to intervene and complete the study. (Def.'s 56.1 Stmt. ¶ 294.)

Estrada also told Vinsky and Bunshaft during the meeting that Schapiro's issues with his performance were not valid and that Schapiro was "out to get him." (Def.'s 56.1 Stmt. ¶ 327.) Vinsky told Estrada that, in addition to Schapiro, the Doctors were also complaining about his performance. (Def.'s 56.1 Stmt. ¶ 329.) Estrada responded, "everybody makes mistakes." (Def.'s 56.1 Stmt. ¶ 329.) Bunshaft told Estrada that he would suspend the employee development plan if Estrada felt he needed assistance with his job or an accommodation. (Def.'s 56.1 Stmt. ¶ 317.) At the close of the meeting, Bunshaft offered Estrada a further leave of absence, despite that fact that Estrada had already exhausted his FMLA leave. (Def.'s 56.1 Stmt. ¶ 332.) Estrada stated during the October 5, 2010 meeting that he was going to speak to his physicians and get back to the Hospital if there was anything that needed to be done. (Def.'s 56.1 Stmt. ¶ 324.) Following the meeting, Estrada sent Bunshaft an emailing thanking him and requesting another meeting to discuss his options. (Def.'s 56.1 Stmt. ¶ 335.) Estrada testified that he did not want to take additional leave because (1) he not afford to do so, and (2) because his doctors did not feel that he needed to take additional leave. (Estrada Dep. 167:1-168:3.)

On October 8, 2010, Bunshaft and Vinsky met with Estrada again. Estrada told them that he had spoken to his physicians and that he did not require a medical leave of absence, or any other

reasonable accommodation. (Def.'s 56.1 Stmt. ¶ 338.) During the meeting, Estrada again wanted to discuss his claim that Schapiro was mistreating him. (Pl.'s 56.1 Countersmt. ¶ 339.) Estrada continued to make errors on the job in October 2010. For example, on October 14, 2010, Estrada performed sequences out of order during a cardiac MRI examination and the exam was stopped by Dr. Reichek. (Def.'s 56.1 Stmt. ¶¶ 352-54.) On October 12, 2010, Estrada spilled fluid onto the floor during a breast MRI exam and the nurse assisting Estrada complained to Schapiro about Estrada's conduct during the exam. (Def.'s 56.1 Stmt. ¶¶ 349-51.)

Estrada had yet another meeting to discuss his performance on October 18, 2010. (Def.'s 56.1 Stmt. ¶ 355.) During this meeting, Estrada did not request any assistance with his job or a reasonable accommodation. (Def.'s 56.1 Stmt. ¶¶ 357.) Once again, Estrada complained that Schapiro was not retraining and or following the employee development plan. (Def.'s 56.1 Stmt. ¶ 359.)

Because of Estrada's numerous complaints about Schapiro's conduct, Bunshaft and Montemarano investigated the issue. (Def.'s 56.1 Stmt. ¶ 360.) They spoke to a number of people at the Hospital, including various doctors, who verified what Schapiro was saying about Estrada's performance. (Bunshaft Dep., Docket Entry 44-3, 31:3-25.) In addition, Bunshaft and Montemarano review various documents relating to Estrada, such as

the employee development training logs. (Def.'s 56.1 Stmt. ¶ 364.)
Bunshaft recalled during his deposition that he concluded that
Estrada had "training appropriate to his position." (Bunshaft
Dep. 32:6-8.)

On October 21, 2010 Schapiro sent Montemarano the final
results of Estrada's employee development plan. Estrada did not
pass the majority of the competencies set forth in the plan.
(Def.'s 56.1 Stmt. ¶¶ 370-71.) Despite Estrada's failing grade,
the Hospital decided to extend Estrada's employee development plan
for one more month. (Def.'s 56.1 Stmt. ¶¶ 374, 376.) The Hospital
therefore advised Estrada that he would have one additional month
to improve his performance. However, the Hospital issued Estrada
a corrective action notice, which is a form of discipline. (Pl.'s
56.1 Countersmt. ¶ 374.) It is undisputed that at the October 25,
2010 meeting, Vinsky again asked Estrada if there was anything
that the Hospital could do to assist him it with his performance,
if he needed any reasonable accommodations, or if he needed another
leave of absence. (Pl.'s 56.1 Counterstmt. ¶ 378.) Estrada again
denied needing assistance or an accommodation. (Pl.'s 56.1
Countersmt. ¶ 379.)

Estrada's poor performance did not improve even after
his employee development plan was extended. (Def.'s 56.1 Stmt.
¶ 383.) For example, on October 26, 2010, Estrada improperly
placed two connector tubes to insert contrast during a scan when

the protocol required three tubes.  (Def.'s 56.1 Stmt. ¶ 384.)
The next day, Estrada took poor scans of a patient and improperly
changed the parameters while performing an MRI exam.  (Def.'s 56.1
Stmt. ¶¶ 388-89.)  Then on October 28, 2010, he took fifty minutes
to complete a portion of a cardiac MRI examination that should
have taken twenty minutes. (Def.'s 56.1 Stmt. ¶ 390.)  On the same
day, he allowed a patient to wear gold necklace into the MRI
examination room, despite Schapiro's direction to have the patient
remove the necklace. (Def.'s 56.1 Stmt. ¶¶ 391-95.)  It is
undisputed that a patient who wears ferrous metal objects during
an MRI exam is at risk of receiving burns.  Estrada made similar
errors with frequency in November 2010.  (Pl.'s 56.1 Counterstmt.
¶¶ 411-16.)

On November 10, 2010, Estrada contacted Montemarano to
schedule a meeting to "give [her his] side of the facts." (Def.'s
56.1 Stmt. ¶ 422 (alternation in original).)  During their meeting,
Estrada complained that Schapiro was harassing him and subjecting
him to a hostile work environment. (Def.'s 56.1 Stmt. ¶ 425.)
However, Estrada did not request any assistance or reasonable
accommodations from the Hospital for his medical conditions at
that time.  (Def.'s 56.1 Stmt. ¶ 428.)

Estrada sent a memorandum to Montemarano on November 16,
2010, alleging that the Hospital was subjecting him to disability
discrimination and harassment.  Estrada specifically complained in

the memo about Schapiro's purported harassment and blamed his continuing problems with his employee development plan on Schapiro's unwillingness to assist him. (Montemarano Aff., Docket Entry 30, Ex. S.) In the memorandum, Estrada also made several requests. He asked: (1) "as an accommodation not to be yelled at or criticized 'out of the blue,'" (2) the he be given "some warning or sign that some 'news'" [would] be provided to [him], and (3) that the Hospital discuss the possibility of a transfer with him. (Montemarano Aff. Ex. S.)

It is undisputed that Estrada was not asking to be transferred to a different part of the Hospital because of his inability to perform his job as an MRI technologist. (Pl.'s 56.1 Counterstmt. ¶ 439.) Rather, he wanted to discuss a transfer due to the issues he was having with Schapiro. (Def.'s 56.1 Stmt. ¶ 440.)

Montemarano and Bunshaft took no action in response to Estrada's memorandum because they believed his discrimination and harassment allegations were meritless, having investigated Estrada's previous complaints about Schapiro. (Def.'s 56.1 Stmt. ¶ 448.)

On November 22, 2010, following the conclusion of the one-month extension of Estrada's employee development plan, Schapiro sent emails to Vinsky, Montemarano, and Bunshaft, containing his notes detailing fourteen errors he believed Estrada

made from October 26, 2010 to November 19, 2010, the development plan study log, and an evaluation document. Schapiro determined that "Mr. Estrada did not meet the requirements of the extended employee development plan." Therefore, Schapiro recommended that Estrada's employment be terminated. (Schapiro Aff. ¶ 100, Ex. CC.) The ultimate decision to terminate Estrada's employment was made by Vinsky, Schapiro, Dr. Reichek, Montemarano, Bunshaft, and legal counsel. (Def.'s 56.1 Stmt. ¶ 454.) On December 1, 2010, Vinsky, Schapiro, and Montemarano met with Estrada to inform him of the Hospital's decision. (Def.'s 56.1 Stmt. ¶ 455.) The Hospital asserts that it terminated Estrada's employment because of his overall poor performance, his failure to meet the requirements of his employee development plans, and his potential danger to patients. (Def.'s 56.1 Stmt. ¶ 459.)

After his termination, Estrada applied for Social Security Disability Income ("SSDI") benefits from the Social Security Administration ("SSA"). (Def.'s 56.1 Stmt. ¶ 495.) Estrada's SSDI application states that he stopped working on December 2, 2010 "[b]ecause of [his] condition" and that his "conditions have worsened over time and [he is] no longer able to work." (Def.'s 56.1 Stmt. ¶¶ 500-01.) On June 19, 2012, the SSA approved Estrada's application for SSDI Benefits, and Estrada does not dispute that he has been totally disabled and unable to work as an MRI technologist since December 2, 2010 due to his medical

conditions. (Def.'s 56.1 Stmt. ¶¶ 504-05.) Further, Estrada admitted during his deposition that he was not aware of any accommodations that would have allowed him to continue working as an MRI technologist at the DeMatteis Center. (Def.'s 56.1 Stmt. ¶ 508.) Estrada claims, however, that it was "Schapiro's continued mistreatment [that] . . . exacerbated his conditions to the point where he could not work." (Pl.'s 56.1 Counterstmt. ¶ 505.) Moreover, he claims that it is possible that the Hospital could have come up with some kind of accommodation that would have allowed Estrada to continue working, if they were willing to engage in an "interactive process" with him. (Pl.'s 56.1 Countersmt. ¶ 508.)

Pending before the Court is the Hospital's motion for summary judgment. The Hospital argues, <u>inter</u> <u>alia</u>, that: (1) Estrada should be judicially estopped from asserting a disability discrimination claim; (2) he lacks the necessary evidence to make out a <u>prima</u> <u>facie</u> hostile work environment claim; and (3) as a matter of law, he cannot prove that he was retaliated against because of his disability or because he took FLMA leave. (<u>See</u> <u>Generally</u> Def.'s Br., Docket Entry 36.)

DISCUSSION

The Court will first address the applicable legal standard on a motion for summary judgment before turning to the parties' arguments.

I. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome

a motion for summary judgment.  Knight v. U.S. Fire Ins. Co., 804
F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d
319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials
will not suffice." (citation omitted)); Weinstock, 224 F.3d at 41
("[U]nsupported allegations do not create a material issue of
fact.").  "The same standard applies where, as here, the parties
filed cross-motions for summary judgment . . . ."  Morales v.
Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing
Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)).
Thus, even if both parties move for summary judgment and assert
the absence of any genuine issues of material fact, "a district
court is not required to grant judgment as a matter of law for one
side or the other."  Heublein, Inc. v. United States, 996 F.2d
1455, 1461 (2d Cir. 1993).  "Rather, each party's motion must be
examined on its own merits, and in each case all reasonable
inferences must be drawn against the party whose motion is under
consideration."  Morales, 249 F.3d at 121 (citation omitted).

II.  Disability Discrimination

        The ADA prohibits discrimination against a "qualified
individual on the basis of disability" in the "terms, conditions,
and privileges of employment."  42 U.S.C. § 12112(a).  Claims under
the ADA, such as the one Estrada raises here, are subject to the
same burden-shifting framework under McDonell Douglas as Title VII
claims.  See, e.g., Heyman v. Queens Vill. Comm. for Mental Health,

198 F.3d 68, 72 (2d Cir. 1999); see also McDonnell Douglas Corp.
v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).
That framework requires a plaintiff to first establish a prima
facie case of discrimination, after which the burden shifts to the
defendant to articulate a legitimate, nondiscriminatory reason for
the adverse employment action.  Holcomb v. Iona Coll., 521 F.3d
130, 138 (2d Cir. 2008).  Once the defendant provides such a
reason, "the burden shifts back to the plaintiff to demonstrate by
competent evidence that the legitimate reasons offered by the
defendant were not its true reasons, but were a pretext for
discrimination."  Leibowitz v. Cornell Univ., 584 F.3d 487, 499
(2d Cir. 2009) (internal quotation marks and citations omitted).

        To establish a prima facie case under the ADA, a
plaintiff must show that: (1) her employer is subject to the ADA;
(2) she was disabled within the meaning of the ADA; (3) she was
otherwise qualified to perform the essential functions of her job,
with or without reasonable accommodation; and (4) she was
discharged due to her disability.  Id. at 422; Heyman v. Queens
Vill. Comm. for Mental Health, 198 F.3d 68, 72 (2d Cir. 1999)
(citing Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d
Cir. 1998)).

        The Hospital argues that Estrada's disability
discrimination claim must be dismissed as a matter of law because,
based on the contradictory statements he made in his SSDI benefits

application, he was not "a qualified person with a disability" as a matter of law under the ADA.  (Def.'s Br. at 5.)  The Supreme Court has held that the "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim."  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 797, 119 S. Ct. 1597, 1600, 143 L. Ed. 2d 966 (1999).  One reason the two statutory schemes can coexist is because the ADA "defines a 'qualified individual with a disability' as a disabled person 'who . . . can perform the essential functions' of [his] job 'with reasonable accommodation,'" while SSA does not take the possibility that an employer could offer a reasonable accommodation into account.  Id. (emphasis added).  Nevertheless, a plaintiff who makes statements in her application for SSDI benefits that are inconsistent with the facts supporting her ADA claim, must explain why the SSDI contention is consistent with her contention that "she could perform the essential functions of her job," at least with "reasonable accommodation."  Id.  While sitting on the Second Circuit Court of Appeals, Justice Sotomayor explained that "summary judgment may be appropriate . . . where SSDI and ADA claims 'involve directly conflicting statements about purely factual matters.'"  Parker v. Columbia Pictures Indus., 204 F.3d 326, 333 (2d. Cir. 2000) (quoting Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 802, 119 S. Ct. 1597, 1601, 143 L. Ed. 2d 966

(1999)); see also Mitchell v. Washingtonville Cent. Sch. Dist.,
190 F.3d 1, 7-9 (2d Cir. 1999).

In Estrada's successful application for SSDI benefits,
he states that he stopped working on December 2, 2010 "[b]ecause
of [his] condition" and is "no longer able to work."  It is
undisputed that Estrada has been completely disabled and unable to
work as an MRI technologist since December 2, 2010 due to his
medical conditions.  Estrada argues, however, that the Court cannot
rely on the statements in his SSDI application because they do not
directly address whether Estrada was able to perform the essential
functions of his job an MRI technologist on December 1, 2010, the
day before he became completely disabled.  But Estrada's assertion,
without explanation, that he was a competent MRI technologist one
day, but completely disabled the next, is not enough to create a
genuine factual dispute about whether he was "qualified to perform
the essential functions of his job" under the ADA.  Although "all
reasonable inferences must be drawn against the party whose motion
is under consideration," it is not reasonable to assume that
Estrada was drained of all competence within twenty-four hours
after his termination.  Morales, 249 F.3d at 121 (citation
omitted).

Plaintiff also argues that the statements in his
application are not actually inconsistent with his assertion that
he was competent to perform the essential functions of his job

because he did not say in his SSDI application which functions of an MRI technologist he could not perform. (Pl.'s Opp. Br., Docket Entry 42, at 13.) But regardless of the lack of detail in Estrada's application, it is objectively inconsistent for Estrada to claim, without explanation, to be qualified one day and the next day claim that his "conditions have worsened over time and he is no longer able to work." Moreover, Estrada has not identified a reasonable accommodation the Hospital could have granted him that would have allowed him to perform the essential functions of his job. Soon before he was terminated, Estrada claimed that he wanted to discuss the possibility of a transfer within the Hospital; but it is undisputed that the purpose of the transfer was to remedy the issues Estrada was having with Schapiro--it was never intended to cure Estrada's performance problems. See Alford v. Turbine Airfoil Coating & Repair, LLC, No. 12-CV-7539, 2014 WL 1516336, at *7 (S.D.N.Y. Apr. 17, 2014) ("Cleveland did not relieve a plaintiff of the burden to prove that he can perform the essential functions of a job with a reasonable accommodation." (Cleveland, 526 U.S. at 806, 119 S. Ct. at 1603)); Emerllahu v. Pactiv, LLC, No. 11-CV-6197, 2013 WL 5876998, at *3-4 (W.D.N.Y. Oct. 30, 2013) (dismissing Plaintiff's disability discrimination claim and noting that the plaintiff did not identify "any accommodation . . . which would allow him to perform [ ] the essential functions of his job triggering the requirements of the ADA") (citation omitted). Since

the statements in Estrada's SSID application are at odds with an essential element of his disability discrimination claim, and he has not provided a legitimate explanation for the inconsistency, he is judicially estopped from asserting his disability discrimination claim.[5]

## III. Hostile Work Environment

Estrada asserts that he was subjected to a hostile work environment by Schapiro. Specifically, he claims that Schapiro repeatedly criticized his work and reprimanded him; did not adequately train him; wrote on a notepad "Ed is dangerous"; blamed Estrada for his divorce and refused to let Estrada take regular breaks. (See Pl.'s Opp. Br. at 29-30.) "Although the Second Circuit has not expressly held that the ADA authorizes claims for hostile work environment, district courts have found that the ADA encompasses hostile work environment claims." Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (Sheindlin J.). "A hostile work environment arises 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" El v. N.Y. State Psychiatric Inst., No. 13-CV-

---

[5] To the extent Estrada brings a separate failure to accommodate claim, his failure to accommodate claim is similarly dismissed because there is no evidence that Estrada could have performed his job with a reasonable accommodation.

6628, 2014 WL 4229964, at *5 (S.D.N.Y. Aug. 19, 2014) (brackets omitted) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 2074, 153 L. Ed. 2d 106 (2002)). To make out a prima facie hostile work environment claim a plaintiff must show: "(1) that plaintiff is a member of a protected class; (2) that plaintiff suffered unwelcome harassment; (3) that plaintiff was harassed because of her membership in a protected class; and (4) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." Scott v. Mem'l Sloan-Kettering Cancer Ctr., 190 F. Supp. 2d 590, 598-99 (S.D.N.Y. 2002). "[A] work environment's hostility should be assessed based on the 'totality of the circumstances.'" Patane v. Clark, 508 F.3d 106, 115 (2d Cir. 2007) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). In assessing the totality of the circumstances, a court might consider: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." Id. (internal quotation marks and citation omitted).

        As an initial matter, Estrada's allegation that Schapiro was overly critical of Estrada's performance is not conduct that is severe and pervasive enough to support a hostile work

environment claim. See Allen v. Verizon Wireless, No. 12-CV-0482, 2013 WL 2467923, at *19 (D. Conn. June 6, 2013) ("allegations of being subjected to scrutiny and feeling undermined do not suggest severe and pervasive treatment . . . nor [did they] in any way suggest that [the plaintiff] was treated in a hostile manner because of her disability" (internal quotation marks and citation omitted)); Murphy v. BeavEx, Inc., 544 F. Supp. 2d 139, 151 (D. Conn. 2008) (stating that alleged harsh criticism is insufficient to establish a hostile work environment claim); LaBella v. N.Y. City Admin. for Children's Servs., 2005 WL 2077192, at *20 (E.D.N.Y. Mar. 28, 2005) ("[A]n employer's conduct is not hostile merely because it is unpleasant, harsh, combative or difficult." (internal quotation marks and citation omitted)). Moreover, Estrada's allegation that Schapiro did not adequately train him is not supported by the record. In June 2010, the Hospital identified that Estrada was having performance problems and put him on a specific employee development plan to address his deficiencies. It is undisputed that, in addition to Schapiro, Dr. Reichek, and Cheng were also involved Estrada's retaining. Five months later, the Hospital extending Estrada's employee development plan after Estrada did not improve. The Hospital even offered to suspend Estrada's employee development plan and grant him additional leave to rest and recuperate. Estrada's repeated claims that Schapiro was not following the development plan are conclusory and not

supported by any specific facts.  Rather, the record shows that Schapiro and the Hospital gave Estrada every opportunity to succeed at his job.

Similarly Estrada's allegations that Schapiro wrote on a notepad "Ed is dangerous," blamed him for his divorce, and did not allow him to take regular breaks is not conduct that is severe and pervasive enough to create an "objectively hostile or abusive work environment." Harris, 510 U.S. at 21, 114 S. Ct. at 370. With respect Schapiro's alleged written and verbal comments, "personal slights and consistent rudeness or disrespect . . . have consistently been held insufficient to trigger hostile work environment protections." Temple v. City of N.Y., No. 06-CV-2162, 2010 WL 3824116, at *6 (E.D.N.Y. Sept. 23, 2010).  Two instances of such conduct certainly is not enough to raise a triable issue of fact as to Estrada's hostile work environment claim.  Although Estrada's claim that Schapiro did not want to give him regular breaks is troubling, Estrada was eventually granted regular lunch breaks.  Thus, taken together, the conduct Estrada describes does not give rise to an actionable hostile work environment claim.[6]

---

[6] Even if the conduct alleged by Estrada was severe and pervasive enough to make out a hostile work environment claim, there is insufficient evidence that the conduct was caused by Estrada's disability.  Fleming v. MaxMara USA, Inc., 644 F. Supp. 2d 247, 262-64 (E.D.N.Y. 2009) aff'd, 371 F. App'x 115 (2d Cir. 2010) (Although the "incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred, they must occur

IV. Retaliation

Estrada's ADA retaliation claim stems from the memorandum he sent on November 16, 2010 alleging that the Hospital was subjecting him to disability discrimination and harassment. (Pl.'s Opp. Br. at 24.)  The burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), governs claims of retaliation under the ADA.  The plaintiff bears the initial burden of establishing a prima facie case of retaliation.  To state a prima facie case of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) his employer was aware of his activity; (3) he suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action.  Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013) (citation omitted).  Once the plaintiff has satisfied the elements of his prima facie case, a presumption of retaliation is created and the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action."  Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)

under circumstances in which the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." (internal quotation marks and citation omitted)). It is undisputed that Shapiro and Estrada were at odds before Estrada's accident.  Indeed, there is no evidence that the conduct Estrada complains of was linked to his disability beyond the conclusory allegation that Shapiro's scrutiny became more severe after Estrada returned from FMLA leave.

(internal quotation marks and citation omitted); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011).  In Title VII cases, once such a reason has been presented, the presumption of retaliation dissipates and the employee must show that the proffered reason was pretextual and the retaliation was the "but-for" cause of the challenged employment action. Sarkis v. Ollie's Bargain Outlet, 560 F. App'x 27, 30 (2d Cir. 2014); Univ. of Tex. Sw. Med. Ctr. v. Nassar, --- U.S. ----, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013).  The Second Circuit has not yet determined whether the "but-for" causation standard applies to ADA retaliation claims, and the Court need not decide this issue.  See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 586 F. App'x 739, 745 n.3 (2d Cir. 2014).

Even assuming that Estrada can make out a prima facie case of retaliation, his claim must fail because he cannot come forward with any evidence, beyond the passage of time, to support the conclusion that his termination was pretextual.  "Temporal proximity--while enough to support a prima facie case--is insufficient to establish pretext." Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 19 (2d Cir. 2013); El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (upholding summary judgment determination on causation grounds; "[a]ppellant produced no evidence other than temporal proximity in support of his charge that the proffered reason for his discharge was pretextual");

Bernard v. JP Morgan Chase Bank NA, 408 F. App'x 465, 469 (2d Cir. 2011) "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise'") (alterations in original) (quoting Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001). Estrada had performance issues at the Hospital before his injury and his problems persisted after he returned from leave. Estrada's performance problems were well-documented, he was counseled by his superiors and HR staff, and he was eventually put on a detailed employee development plan. The employee development plan lasted five months, but still Estrada's performance did not improve. The Hospital nevertheless extended Estrada's employee development plan for a month and offered him the opportunity to take additional leave. Estrada refused to take additional leave and repeatedly denied that he needed any sort of accommodations because of his conditions. Only after Estrada did not show improvement following the month extension of his employee development plan was he terminated. There is no evidence that Estrada was terminated because he complained about discrimination, other than the timing of his discrimination complaint. Thus, under either the "but-for" test for proving causation, or the lesser motivating factor standard, Estrada cannot show that his termination was pretextual.

V.    FMLA Retaliation

        Estrada also claims that the Hospital retaliated against

him because he took FMLA leave.  (Pl.'s Opp. Br. at 28.)  "In order

to make out a prima facie case of retaliation under the FMLA,

plaintiff must adduce evidence that (1) he exercised rights

protected under the FMLA, (2) he was qualified for his position,

(3) he suffered an adverse employment action, and (4) the adverse

employment action occurred in circumstances giving rise to an

inference of retaliatory intent."  Di Giovanna v. Beth Israel Med.

Ctr., 651 F. Supp. 2d 193, 204 (S.D.N.Y. 2009).  Estrada does not

assert that the Hospital terminated him because he took FMLA leave,

but rather points to a number of incidents involving Schapiro as

the basis for his claim.  Estrada specifically asserts that after

he returned from his first period of FMLA leave, Schapiro: (1)

told Estrada that his divorce was Estrada's fault, (2) stopped

responding to his requests for help, and (3) did not allow Estrada

to take regular lunch breaks for a period of time.  Then, after

Estrada's second leave of absence, Estrada claims Schapiro tried

to discipline him.  (Pl.'s Opp. Br. at 28.)  Under the

circumstances of this case, however, these incidents cannot be

found to be adverse employment actions.  For purposes of an ADA

retaliation claim, conduct can be an adverse employment action if

it "could plausibly dissuade a reasonable worker from exercising

[his] FMLA rights."  Smith v. Westchester Cnty., 769 F. Supp. 2d

448, 471 (S.D.N.Y. 2011) (internal quotation marks and citation omitted) (alteration in original). Here, there is objective evidence that Schapiro's actions did not dissuade Estrada from exercising his FMLA rights. In fact, Estrada took a second FMLA leave of absence and the Hospital repeatedly offered Estrada additional leave. However, Estrada testified that he did not take additional FMLA leave because (1) he could not afford to do so, and (2) because his doctors did not feel that he needed to take additional leave. Therefore, the adverse employment actions Estrada points to cannot form the basis of an FMLA retaliation claim as a matter of law.

## CONCLUSION

For the foregoing reasons, the Hospital's motion for summary judgment (Docket Entry 28) is GRANTED in its entirety and this case is DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to enter judgment in favor the Hospital.


SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     November __10__, 2015
           Central Islip, New York